## BEN HINDS *v.* THE STATE.

1. THEFT — EVIDENCE.— The prosecuting witness testified that the defendant told him that he "did not know, but believed that P. and C. took the animal off," and that, acting upon such information, he followed to V. county, arrested P. and recovered the stolen animal. The defendant offered to prove by the witness that he, defendant, loaned him the animal ridden in pursuit. *Held,* that the court erred in sustaining the State's objection to the evidence proposed.

2. SAME.— The State having introduced a confessed thief and an accomplice in the offense for which the defendant was on trial, the defense proposed to prove by him that he was indicted for the same offense, and, by agreement with the county attorney to dismiss the prosecution as to him, had turned State's evidence. *Held,* that such proof was competent, and its exclusion was error.

3. SAME.— E., a State's witness, testified that shortly after another certain animal was stolen, the defendant told him that he knew where some stray horses were running, and proposed to get them up and deliver them to the witness to sell, the two to divide the proceeds. The defendant proposed to prove by one W. that he, W., inquired of defendant if he knew anything of the missing animal, and that the defendant replied that he believed E. knew something of it, and that he would make a proposal to E. and get his confidence, and find out if he had such knowledge; and further, that he subsequently told W. he had made the proposal to E. but was satisfied that E. knew nothing of the horse. *Held,* first, that the defendant's objection to the evidence of E. should have been sustained, and, second, that the State being permitted to make such proof, the defendant was entitled to the evidence of W. as proposed.

4. SAME.— Evidence of a conspiracy between the defendant and others to engage generally in an enterprise of indiscriminate horse-theft, and which has a strong tendency to connect the defendant with the theft of the specific horse charged in the indictment, is admissible.   The conspiracy being shown to have for its purpose the commission of offenses of a certain character, but no specific offense,

the acts, declarations and conduct of each of the conspirators, if a specific offense is committed in furtherance of the general design of the conspiracy, are evidence against each, whether or not the conspirator on trial participated in, agreed to or advised the commission of the specific offense on trial.   See the opinion for the rule discussed.

5. SAME.— See the opinion for evidence held insufficient to corroborate the testimony of an accomplice.

APPEAL from the District Court of Llano.   Tried below before the Hon. A. O. COOLEY.

The indictment charged the defendant and others with the theft of a horse, the property of one O'Banion.   The trial of this appellant resulted in a verdict of guilty, with five years in the penitentiary assessed as punishment.

J. B. O'Banion for the State testified that he owned a paint horse, in Llano county, in August, 1880.   The animal was about 15½ or 16 hands high, had a white spot on the left side of the neck extending from the head to the shoulder, a white spot on the left side, some white on the left side, left flank, under the belly and on the legs; also a white spot on the right side, and another on the right side of the neck, which, being covered by the mane, was not readily noticeable.   He was branded L E on the left hip, and ranged below the town of Llano, down towards Lone Grove in Llano county.   The witness missed his horse in August, 1880, and hunted him all over Llano county until satisfied that he had been stolen.   He received information which caused him to go to Van Zandt county in search of the animal, where he recovered it in November, 1880.   *En route* to Van Zandt county, the witness met Henry C. Paschal and Christian Clark.   He arrested the former and lodged him in the Burnett county jail. Shortly before the October term, 1880, of the District Court, the defendant told the witness that, though he, defendant, did not know it as a certainty, he believed that

Henry C. Paschal and Christian Clark took the horse with them when they went to Van Zandt county to pick cotton.

The defense proposed to prove, on cross-examination, by the witness that the defendant loaned the witness a horse to ride to Van Zandt county, but upon objection by the State the evidence was excluded. The defense then asked the witness whose horse he rode to Van Zandt county in quest of his stolen horse, but the State's objection thereto was sustained. The witness stated that he did not, at any time, tell Paschal who had, or that any one had, notified him that he, Paschal, had taken the horse.

Henry C. Paschal, the principal witness for the prosecution, was next put upon the stand. He testified that he knew the defendant, and William Hinds, John Hughes, Henry Hughes, Christian Clark, Warren Jeffries, Jim Coggins and John Harridge, and knew them on or about August 25, 1880, and for about two months prior to that time. He knew the O'Banion paint horse. Himself and Christian Clark took the said horse to Van Zandt county and traded him for a mare, receiving five dollars as boot. The witness and William Hinds, defendant's son, caught the O'Banion horse near McNutt's farm, on the range in Llano county, about noon or a little later, and tied him on the mountain near the Hatley store. That night the defendant and his son, William Hinds, brought the horse and delivered him to witness and Christian Clark at the Burnett crossing of the Colorado river, about one and a half miles below Bluffton, from whence the witness and Clark took him to Van Zandt county, passing through Burnett and Liberty Hill en route. On their way to Van Zandt county with the horse they overtook R. S. Bell, James Burkett and William McAdams. This all occurred in August, 1880. In November, 1880, the witness met O'Banion on his way to Van Zandt county, looking

for his horse, and was by him arrested and placed in the Burnett county jail.

For two months before the witness and Clark took the O'Banion horse to Van Zandt county, himself, the defendant, Wm. Hinds, John and Henry Hughes, Clark, Coggins, Harridge and Jeffries were frequently together at Murray's store at Lone Grove. At times all the parties named would be together, and at other times only some of them. From the store they were in habit of going to the woods to play cards, remaining in the woods sometimes for three consecutive days. Over objection of the defendant, this witness was permitted to testify that there was an agreement between himself and the parties named to steal and run off horses and sell them; that the defendant was present sometimes when this enterprise was discussed by the parties to it, and that he, the witness, understood that the defendant was a party to it. The witness was permitted, also, to testify, over objection by defendant, to conversations between the witness and the other parties, in the absence of the defendant, concerning the stealing and sale of horses, and to the theft by himself and others of the party of a number of horses at different times, without showing that the defendant knew of or was concerned in such thefts.

According to the understanding of the witness there was a common agreement between the witness, defendant and the other parties named, to steal horses, sell them and divide the proceeds. In pursuance of this agreement, the witness and Christian Clark drove off the George Trent horse and sold it in Lampasas. On their return they told Coggins, Harridge and Henry Hughes where they sold the Trent horse. These parties said that it had been sold too near home, and went to Lampasas and "proved" the horse away from the purchaser, and took it off. In pursuance of the same agreement, Jeffries and John Hughes stole the Pritchard horse, and the wit-

ness a big bay horse and several "strays." The witness assisted the defendant pen some horses at Pecan Grove, branded 87, which defendant said were strays, and that he was going to take them up about or towards Fredericksburg and sell them. Witness has never seen the horses since.

On cross-examination this witness stated that if the defendant knew anything about the theft of any horses by the party, other than that of the O'Banion horse, he, the witness, did not know it, but as he, defendant, talked about other thefts of horses, the witness supposed he did know. The agreement to engage in horse stealing was entered into between witness, John and Henry Hughes, Coggins, Harridge and Clark. The witness did not know when the defendant first became a party to it, or where he first canvassed the enterprise with him and others, or who was present. The defendant at no time spoke to the witness of taking any particular horse or horses save the O'Banion horse and the estrays in the 87 brand. If he, defendant, knew of any of the other thefts mentioned, the witness was not apprised of the fact.

When this witness was first introduced the defense challenged his competency to testify upon the ground that he had been indicted for the same offense (which the State admitted), which indictment had not been dismissed; and the objection was overruled. At another stage of his examination the defense proposed to prove by him that he had turned State's evidence under an agreement with the county attorney to dismiss the prosecution against him for the same offense. The State objected and the evidence was excluded. The defense objected throughout the entire examination of this witness, to all evidence relating to the theft of any horse or horses other than the O'Banion horse mentioned in the indictment; but the objections were overruled.

R. S. Ross testified for the State that in August, 1880,

himself, James Burkett and William McAdams left their homes near Lone Grove in Llano county, and went below to pick cotton. The day they left, they met Christian Clark, about a mile and a half from Burn's store, traveling from towards Bluffton, and going towards Lone Grove. The parties took dinner together that day. On the second day thereafter, Henry C. Paschal and Clark overtook the witness and his companions in Williamson county. Paschal was riding a paint horse, which he then recognized as a horse once owned by Russell, but which he has since learned was then owned by O'Banion, and was leading a bay pony. The testimony of James Burkett and Wm. McAdams was substantially the same as that of Ross.

A. A. Murray testified that defendant, Wm. Hinds, Paschal, Clark, John and Henry Hughes, Coggins, Harridge and Jeffries were frequently at his store during the two months before the O'Banion horse was missed, but he did not know that all of them were together at any one time. When they met at the store they generally went off into the woods together, as the witness understood from their conversation, to play cards. The witness did not know where Wm. Hinds, John and Henry Hughes, Harridge, Clark or Coggins were at the time of this trial. They left during the winter. Jeffries was then in the Llano county jail. This witness was permitted to state, over objection of defendant, that some campers claimed to have lost some horses about the time the O'Banion horse disappeared.

Wm. Yett testified that he knew defendant in August, 1880. On a Friday, between the 20th and 25th of August, while the witness was at Hatley's store, the young man called Wm. Hinds galloped by, leading a dark bay paint horse. The horse had a white spot on its neck, running the whole length from the head to the shoulder, a white spot on its side, and some white on its flank and under its belly. Within a minute or two the defendant

galloped up to the store, and either asked if anyone had passed, or if his son had passed, and presently followed in the same direction in a gallop. These parties went down the Burnett road, towards the Burnett crossing of the Colorado.

Cross-examined, the witness said that it was about fourteen miles from Hatley's store to the Burnett crossing of the Colorado. The witness knew the paint horse owned by the defendant, and had seen it several times, but did not know that he had ever seen it before he saw the paint horse led by Wm. Hinds on the occasion referred to. The defendant's was a light bay paint, medium sized, cow pony.

Harry Estes, over the objection of the defendant, testified that in August, 1880, the defendant told him that he knew of some stray horses down about Flat Rock; that he would get them up and turn them over to witness, if witness would take them off and sell them, the two to divide the proceeds. The witness replied that he was not too good to steal, but was too much of a coward.

On his cross-examination, this witness testified that this proposition was made to him by the defendant shortly after the Trent horse was missed. After the witness had declined, the defendant asked him if he knew anything of the Trent horse. The witness believed then that the defendant was laying a trap for him, to find out whether or not the witness would steal. At this juncture the defendant proposed to prove by the witness that, a short time after the proposal, the witness told Williamson of it, and that Williamson told the witness that he, Williamson, knew before the proposition was made, that the defendant was going to make it to the witness, in order to find out whether or not the witness knew anything about the disappearance of the Trent horse. The State objected, and the defense was not permitted to make the proof.

W. E. Hatley testified for the defense that he was present at his store on the occasion testified to by Wm. Yett, when Wm. Hinds, followed by the defendant, passed, leading a paint horse. The witness knew that the defendant owned a paint horse at the time. He had often seen the defendant and Wm. Hinds riding it, and had often seen it tied at the store. The witness had never paid enough attention to the defendant's paint horse to be able to give an accurate description of it. Wm. Hinds led the horse down the public road, towards Murray's store, which is three-fourths of a mile distant from the witness's store.

A. A. Murray testified for the defense that about the 15th of August, 1880 (he could not state accurately the day of the week or month), the defendant and Wm. Hinds came to his store, the latter leading a paint horse. They stopped at the well and watered their horses. The witness knew that defendant owned a paint horse at that time, and took the horse which Wm. Hinds was leading to be the one owned by defendant. When they left the well they turned off the Burnett road, and went towards James Williamson's house; in going to which, they would have to pass two or three houses.

James Williamson, for the defense, testified that sometime in August, 1880, the defendant and Wm. Hinds came to his house, and remained over night. Wm. Hinds was leading a paint horse that belonged to the defendant. The witness knew the horse well, and knew that it was the paint horse which the defendant owned. The defendant's paint horse was a good-sized cow pony, worth forty dollars — a common bay paint, with white on the sides and neck, and on the legs and belly. The opinion sets out other evidence proposed to be made by this witness, but which was excluded by the court below.

The evidence of Paschal for the prosecution timed the delivery of the stolen animal to him by defendant and

Wm. Hinds, at the Burnett crossing, on either the Thursday or Friday night before the Saturday morning on which a certain horse race was run on Wright's Creek, twenty miles distant from the Burnett crossing. Several witnesses testified for the defense that the defendant and Wm. Hinds were at the race course, or *en route* to it, from one o'clock P. M. on Friday, until noon on Saturday, after the race had been run — that they camped on the race track on Friday night, and remained there throughout the night.

*Julius Oatman* and *W. W. Martin*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

Hurt, J. The appellant was convicted of theft of a horse. The State, by the owner, J. B. O'Banion, proved that the defendant told him, the witness, that he (defendant) thought he, witness, would find his horse in Van Zandt county; that he, defendant, did not know "but that he believed that Henry C. Paschal and Christian Clark carried his horse off, when they went below to pick cotton." O'Banion in pursuance of this information went to Van Zandt county, arrested Paschal and found his horse. The defendant proposed to prove by the witness O'Banion that he loaned him his horse to ride to Van Zandt county in pursuit of the thieves and his horse. The district attorney objected to this evidence and the court sustained the objection; to which the defendant excepted.

This proof could have been adduced for no other purpose than to show a guilty knowledge on the part of the defendant, and in this manner prove his participation in the theft of the horse. If the above fact, under the circumstances of this case, could have this effect, certainly all attending facts and circumstances connected with this matter are admissible.

There is no evidence to prove that either Paschal, Clark or the defendant was suspected of complicity in the theft. This being the case, we cannot conceive how it is possible to torture the conduct of the defendant in this matter into an inculpatory fact. A.'s neighbor's horse is stolen; he goes to him and informs him that he does not know but believes that P. and C. have taken and carried him to another county. A. may know or be informed of facts tending to induce this belief, and be perfectly innocent of any connection with the theft. To hold otherwise would, to our minds, be monstrous. Such doctrine would jeopardize the liberty and reputation of any person who has knowledge, either personal or from others, of facts showing the commission of crimes. And if to disclose his opinion, and thereby lead the owner to catch the thief and reclaim his property, is to be construed into evidence against the informer, the punishment of criminals would not only be rare, but very dangerous to others besides the thief. However, if such conduct, which appears to us consistent with and worthy of a good citizen, is to be viewed in a criminal light, every fact and circumstance connected with and calculated to explain or negative this illogical view, are evidently admissible.

One Henry C. Paschal, a confessed thief, and an accomplice in this case, was introduced by the State. This witness swore to facts which, if true, fixed guilt upon defendant beyond any sort of question. Defendant proposed to prove by this witness "that there was an agreement between him and the district attorney that he, the district attorney, would dismiss the prosecution against him for the theft of the horse mentioned in the indictment in this cause, provided the witness would turn State's witness herein." To this the district attorney objected; which objection was sustained by the court, and defendant excepted. We must assume that defendant could have proven the facts offered; and that being the

case, let us re-state the proposition. A. is on trial for theft; P. is a very important witness against him; he is not only an avowed thief and an accomplice, but A. proposes to prove that he is indicted for the same theft, and that there is an agreement between him and the district attorney to dismiss the prosecution against him if he will become a witness against A. Had A. the right to make this proof? Beyond all controversy he had. This question is beyond the range of discussion. If an authority could be found holding otherwise, it would be opposed to the plain principles of justice.

The State proved by one Estes that "defendant told the witness that he knew of some stray horses down on Flat Rock, and that he, defendant, would get them up and turn them over to me, witness, if I would take them off and sell them, and that we would divide." This proposition was made to the witness a short time after the George Trent horse had been stolen. The defendant proposed to prove by one James Williamson, that he, Williamson, made inquiry of defendant about the George Trent horse, that was alleged to have been stolen, and that, at the time he made the inquiry and a short time before defendant made the proposals to the witness Henry Estes, and about which said Estes testified, defendant said to Williamson: "I believe Harry Estes knows something about what became of the Trent horse, and I will make a proposal to him, and get his confidence, and if he knows anything about the Trent horse I will get it out of him." "And further defendant proposed to prove by said Williamson that, shortly after the proposal was made to Harry Estes, defendant told Williamson he had made the proposal to Estes, and that he was satisfied from what Estes said and did that he, Estes, knew nothing about the Trent horse." The district attorney objected, and the court sustained the objection; to which the defendant excepted.

Surrounded by these proposed facts, the proposal to Estes was consistent with the conduct of an innocent man; hence their admissibility was clearly proper and legal. Without these surrounding facts, the proposal to Estes only tended to prove defendant a thief generally, but did not tend to connect him with the theft of the horse in question further than the probability that all thieves will steal, and that therefore he stole the horse belonging. to the prosecutor in this case. The defendant objected to this evidence, but his objection, which should have been sustained, was overruled; being adduced by the State, he was very evidently and justly entitled to the proposed, but rejected evidence.

The State proved by the witness Paschal that there was a conspiracy, in fact a compact, entered into by and between defendant, witness, and quite a number of others, to engage in the business of horse-stealing generally; and that, before defendant entered into this compact, and afterwards, members of this thieving firm had stolen a number of horses from that vicinity,— to all of which defendant objected. What is the effect of this evidence? What does it tend to prove? Is there any specific tendency indicated by it? Does it disclose an intention to steal the horse in question? It does, but with no greater degree of certainty than to steal every horse in range of the operations of this band of thieves. A. enters into a conspiracy to steal horses generally; a number of horses are taken by members of the conspiracy. B.'s horse is stolen. Is this evidence against A.? Again, if A. did enter into this agreement, and horses were stolen by members thereof, can the conclusion be higher, or be more pointed or specific than one drawn from the fact that A. is an incorrigible and confirmed horse thief? We think so; for in this case the theft of any horse is within the scope of the unlawful compact, and is embraced within its bounds, and each member thereof is in law and morals an actor. We are not to be understood as holding

that this proof, standing alone, would be sufficient to convict; we are discussing the competency or admissibility of evidence.

But let us return to the evidence of Paschal. His evidence on this matter is to the effect that defendant entered into the conspiracy to steal horses generally. There is no complicity of defendant shown by his evidence, in the thefts of the horses which were taken in that vicinity. We do not allude to the horse charged to have been stolen in this indictment. A conspiracy to steal horses generally, without a participation by defendant in any theft being shown, is all that can be inferred from the evidence of Paschal upon this point. What is the rule? It is held by a number of authorities that "where the evidence tended to *show a privity* and *community* of *design* between the prisoners to commit offenses of the *character charged* against him, great latitude is allowed in giving in evidence the acts, declarations and conduct of each and all the associates in furtherance of their common unlawful purpose; and such acts, declarations and conduct are evidence against each of them." This proposition is announced in *Mason* v. *State,* 42 Ala. 532, and is made to apply to an offense which was not specifically intended, but was embraced under the general purpose of the conspiracy, to wit, to engage in the burglary business generally.

· The principle stated in these cases is this: that when a privity and community of design is shown between other parties and defendant to engage in the commission of offenses of the same *character* as that *charged* against defendant, great latitude is allowable in giving in evidence the acts, declarations and conduct of each and all of the associates, in furtherance of the common unlawful purpose; and such conduct, acts and declarations are evidence against each of them. The point at issue is this: if the conspiracy has for its object the commission of some ·specific offense, such as the theft of a certain horse, or

the horses of a certain man, the conspiracy being first shown, the acts, declarations and conduct of each member are evidence against each. But, if the object be the commission of offenses of a certain character, but no specific offense, are these acts, declarations and conduct, evidence? In the one case the object is to steal A.'s horses; in the other, the object is to steal any and every person's horse. In the latter case, the purpose being so broad, A.'s horses would certainly be included therein; and the rule applicable to the one would apply to the other. Nor is the principle affected by the fact that the evidence fails to show that defendant participated in the thefts committed by the other members; for, if they were committed in furtherance of the common design, each member of this company of rogues would be held culpable, notwithstanding he did not take part in, or advise, or agree to this particular offense. The object of this copartnership being so broad and comprehensive in its nature, each member thereof is fully authorized to steal the horse of any person, having for his support the advice, consent and approval of all the conspirators. *Mason* v. *State*, 42 Ala. 532; *Carroll* v. *Com.* 84 Pa. St. 107; 2 Hawley, 290; *Campbell* v. *Com.* 84 Pa. St. 187; *Hester* v. *Com.* 85 Pa. St. 139.

Now let us apply this doctrine. A. is upon trial for the theft of B.'s horse; the State adduces evidence strongly tending to connect him with the theft. To strengthen and corroborate this evidence the State proposes to prove that he belongs to a band of thieves, who are confederated together for the purpose of stealing horses generally; — is this legal evidence? Though this is a question in regard to which the authorities are not harmonious, we believe that the admissibility of this evidence rests upon principle, and has for its support a solid foundation in the rules of justice.

The witness Paschal swears to this conspiracy. He, however, is a confessed thief and an accomplice to the

theft of the horse in question. Is he corroborated? We think not. The only attempts at corroboration are, first, that defendant and the other members were in the habit of meeting in the woods near —— store. A number of witnesses testify to these meetings. But no witness swears to any fact tending to show that these meetings were for any such purpose as that claimed by Paschal. On the contrary, the evidence most unquestionably proves that not only the persons claimed to be members of the conspiracy by Paschal met there, but others, and in the woods; and the evidence clearly shows the purpose of these meetings, which was to engage in the very baneful and unprofitable business of playing cards. The second ground upon which a corroboration is claimed is that defendant and his son were seen at a time corresponding with that sworn to by Paschal, leading a horse suiting the description of O'Banion's, in the direction of the place at which Paschal received the O'Banion horse from defendant and his son. The evidence leaves it very doubtful whether this was the horse of O'Banion or that of the defendant; they having horses quite similar, especially in color. If there is a preponderance, we think it is in favor of defendant. To be a criminative fact, the proof must show clearly that the horse was O'Banion's; for conclusions cannot rise higher or be more certain than the facts from which they are made. If this was the horse of O'Banion, Paschal was not only corroborated, but very strongly supported. If not, there was no corroboration. There were a great many facts sworn to by Paschal which were also testified to by a number of witnesses. None of these facts, however, tended in the slightest degree to connect defendant with the crime. This character of corroboration will not suffice.

For the errors above indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*